UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AR and KR, *on behalf of* MR,

                     Plaintiffs,

        v.

KATONAH LEWISBORO UNION FREE
SCHOOL DISTRICT,

                  Defendant.

No. 18-CV-9938 (KMK)

OPINION & ORDER

---

Appearances:

Peter David Hoffman, Esq.
Law Office of Peter D. Hoffman, PC
Katonah, NY
*Counsel for Plaintiffs*

David Hannum Strong, Esq.
Steven Leon Banks, Esq.
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

       Parents AR and KR ("Plaintiffs") brought this Action individually and on behalf of their son, MR, against the Katonah Lewisboro Union Free School District ("Defendant" or "the District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (*See* Compl. (Dkt. No. 4).) The dispute arises out of the decisions of the Independent Hearing Officer ("IHO") and the State Review Officer ("SRO") who adjudicated Plaintiffs' administrative claims for relief arising out of Defendant's alleged failure to provide MR appropriate Individualized Education Programs ("IEP"s) during the 2015–16, 2016–17, and 2017–18 school years. Before the Court are both Parties' Motions for Summary Judgment.

(Not. of Mot.; Not. of Cross Mot. (Dkt. Nos. 15, 23).)  For the following reasons, the Court

denies Plaintiffs' Motion for Summary Judgment and grants Defendant's Cross Motion for

Summary Judgment.

## I.  Background

### A.  Factual Background[1]

Plaintiffs are the parents of MR, who was diagnosed with apraxia during MR's preschool

years and began receiving speech-language therapy services before the age of two.  (Def.'s 56.1

Statement in Supp. of Cross Mot. for Summ. J. ("Def.'s 56.1") ¶ 3 (Dkt. No. 24).)  Apraxia is a

"neurological developmental condition where the motors center of the brain is affected" in a way

that causes individuals to have "difficulty formulating words, articulating words, pronouncing

words, [and] retrieving words and word sounds." (*Id*. ¶ 4.)  From kindergarten through fifth

grade, MR attended the District's public schools.  (*Id*. ¶ 5.)  While attending the District's

schools, the Committee on Special Education ("CSE") developed IEPs for MR.  (*Id*. ¶ 6.)  At the

start of MR's sixth grade year, the 2015–16 school year, however, Plaintiffs unilaterally placed

MR at Eagle Hill School ("EHS"), a private school.  (*Id*. ¶ 7.)  Plaintiffs continued to unilaterally

place MR at EHS for the 2016–17 and 2017–18 school years.  (*Id*. ¶¶ 8–9.)  In this Action,

Plaintiffs seek reimbursement for the tuition paid to EHS as a result of those three years of

unilateral placement.  (*Id*. ¶ 10.)

---

[1] When the Court cites to one of the Parties' 56.1 statement, that fact is materially
undisputed, unless noted by the Court.  Exhibit cites refer to sealed exhibits provided to the
Court as part of the State Administrative Hearing Record.  (*See* Dkt. (entry for June 10, 2019).)
These same exhibits, with the same labels, were before the IHO and the SRO.  "IHO Hr'g Tr."
refers to a transcript of the hearing that occurred before the IHO, which is also part of the State
Administrative Hearing Record.

1.  2012–15 IEPs

Although not directly pertaining to the amount of requested tuition reimbursement, MR's IEPs in the years prior to 2015, when MR attended school within the District, are relevant to the extent they inform the inquiry into how reasonable the District's subsequent IEPs were. Accordingly, the Court provides a brief summary of MR's progress leading up to 2015.

As part of MR's triennial evaluation for the 2011–12 school year, MR participated in cognitive testing, which revealed extremely low scores in cognitive tests known as the Woodcock Johnson III Cognitive Tests ("WJCT"), Clinical Evaluation of Language Fundamentals – Fourth Edition ("CELF-4"), and the Kaufman Assessment Battery for Children-2 ("KABC-II"). (*See* Ex. 3 ("2013–14 CSE Meeting") 4.) For example, the tests showed that MR scored in the first percentile or below in core language, expressive language, cognitive fluency, processing speed, and fluid-crystallized index. (*Id*.) For the 2012–13 school year, MR was originally placed in a general education class; however, due to significant struggles, MR was placed in a self-contained special education class beginning mid-year. (*See* IHO Hr'g Tr. 22–24.) Plaintiffs were concerned about how "restrictive and . . . appropriate" that setting was "due to the level of disability of the other children," and "insisted on opportunities for mainstreaming." (Ex. D ("Dr. Dietrich Evaluation") 2.) For the following school year, 2013–14, the CSE recommended placement in special education classes for most subjects, and related services of occupational therapy, speech-language therapy, and both small group and individual counseling. (*See* 2013–14 CSE Meeting 1.)

At the CSE for the next school year, the 2014–15 CSE meeting notes indicate that MR's special education teacher reported that MR was making "good progress in the reading program," and that MR was beginning to read at the second-grade level. (Ex. 4 ("2014–15 CSE Meeting")

1.) The report also indicates, among other things, that MR was "writing paragraphs on specific topics," "doing multiplication" in math, and that AR stated that she "sees that [MR] is finally really getting it and understands with better math sense." (*Id*.) The meeting notes also indicate, however, that MR was still struggling to answer "higher level questions" and that when MR was "unsure," MR was less willing "to take risks." (*Id*.) Taking all of this into account, the CSE meeting record indicates that MR had nevertheless "achieved all of [MR's] IEP goals" from that year, so the CSE recommended a similar placement for the 2014–15 school year, MR's fifth grade year. (*See id*. at 1–2.)

In October 2014, Plaintiffs hired a tutor, Denise Racanelli ("Racanelli"), to help MR with reading and writing skills. (IHO Hr'g Tr. 1158–64.) Racanelli testified that it was "very hard to pick independent reading books for [MR]," and that she attempted to maintain "continuity" with what MR's special education teacher was doing at school, because Racanelli did not want to "have too many different . . . pieces of learning and . . . strategies going on at the same time." (*Id*. at 1169–70.)

### 2. Spring 2015 Triennial Review

In Spring 2015, as part of a triennial review of MR's performance level and individual needs, the CSE referred MR for a psychological evaluation, an educational evaluation, and a speech-language evaluation. (Def.'s 56.1 ¶ 11.) In addition, at Plaintiffs' request, MR was referred for an audiological evaluation and a private psychological evaluation. (*Id*. ¶ 12.) Plaintiffs testified that they requested these psychological evaluations because MR was entering middle school and they "were very worried about how [MR] was going to handle" it, and because they "were looking for answers." (IHO Hr'g Tr. 518–19.)

The speech-language evaluation involved the administration of the Clinical Evaluation of Language Fundamentals – Fifth Edition ("CELF-5"), which seeks to evaluate "core language, expressive and receptive language, language content, and language memory."  (Def.'s 56.1 ¶¶ 13–15.)  The CELF-5 report stated that MR's "overall language index scores were in the below average range as compared to students in [MR's] chronological age group (2%ile in receptive language and 3%ile in expressive language)."  (*Id*. ¶ 16.)  The speech-language evaluation also involved the administration of the Test of Auditory Processing Skills-3 ("TAPS-3").  (*Id*. ¶ 17.)  The report stated that, based on the TAPS-3, MR's "speech intelligibility is good for conversational speech" with "an overall weak expressive and receptive language profile."  (*Id*. ¶ 20.)  The report also stated that MR had "demonstrated significant growth since [the] last [speech/language] evaluation in October 2011."  (*Id*. ¶ 21.)

On March 10, 2015, the audiological evaluation requested by Plaintiffs occurred.  (*Id*. ¶ 22.)  It was conducted by Ida Wise, Au.D, CCC ("Dr. Wise").  (Ex. 13 ("Dr. Wise Evaluation") 13.)  The evaluation characterized MR's hearing as "within normal limits bilaterally," but noted that "testing identified the presence of a central auditory processing disorder," or "CAPD."  (Def.'s 56.1 ¶ 23.)  This disorder, according to Dr. Wise, affects MR's "temporal processing and timing aspects of speech."  (*Id*. ¶ 24.)  Dr. Wise made several recommendations relating to MR's education, including reduction of visual distractions, reduction of classroom noise level, extra time for "processing information when questions are asked," the use of an FM assistive hearing system "as a possible accommodation within the classroom," and continued "reading support."  (Dr. Wise Evaluation 11–13.)  Dr. Wise clarified that an FM system would not "be required" within a "small class environment," which MR was in at the time.  (*Id*. at 13.)

The educational evaluation was conducted by MR's special education teacher on April 6, 2015. (Def.'s 56.1 ¶ 27.) The evaluation report indicated that the special education teacher administered the Woodcock-Johnson III Tests of Achievement ("WJTA"). (*Id.* ¶ 28.) The report describes the WJTA as "a comprehensive, individually administered test, which assesses a student's academic achievement in reading, mathematics, and written language." (*Id.* ¶ 29.) In mathematics and written language, MR scored in the "low range" or "low average range" for those subtests. (*Id.* ¶¶ 32–33.) On the writing samples subtest, MR scored in the "average range." (*Id.* ¶ 34.)

A private clinical psychologist, Jeanne Dietrich, Ph.D. ("Dr. Dietrich"), evaluated MR on April 1, 2015. (*Id.* ¶ 35.) The evaluation revealed that MR's processing speed for written work and working memory was deficient, that MR's reading decoding skills were at the first percentile, and that MR had low scores in math computation and average scores in verbal comprehension and perceptual reasoning. (*Id.* ¶¶ 39–42.) Accordingly, Dr. Dietrich diagnosed MR with dyslexia. (*Id.* ¶¶ 43–44.) Dr. Dietrich characterized MR as "of at least average intelligence," based on MR's performance on a procedure known as the Wechsler Intelligence Scale for Children - Fourth Edition ("WISC-IV") and a statistic known as the general ability index. (*Id.* ¶¶ 36, 45; IHO Hr'g Tr. 1224–27.) Dr. Dietrich also administered the KABC-II test, (Def.'s 56.1 ¶ 36), which, according to Dr. Dietrich, "assesses the coding, storage[,] and recall of auditory-visual stimuli," and concluded that MR "scored low" on it, (Dr. Dietrich Evaluation 25).

The District's psychological evaluation of MR was conducted by a school psychologist, Michael Weschler, M.S. ("Weschler"), on May 20 and May 21, 2015. (Def.'s 56.1 ¶ 46; *see* Ex. 6 ("Weschler Evaluation") 1, 11.) The report stated that Weschler had previously examined MR

in September 2011.  (Def.'s 56.1 ¶ 47.)  During the 2015 evaluation, Weschler administered the WJTA and the Comprehensive Test of Nonverbal Intelligence – Second Edition ("CTONI-2"). (*Id*. ¶ 48.)  The report stated that, as to the WJTA, MR's scores were in the "extremely low range," and on the CTONI-2, in the borderline or low average ranges.  (*Id*. ¶¶ 50, 53.)  Weschler reported that MR's performance on the WJTA "describes [MR's] general intellectual ability within the extremely low range relative to the normative sample of [] age matched peers."  (*Id*. ¶ 54.)  Weschler reported that MR showed improvement in visual processing abilities compared to a prior psychological evaluation in 2011, but that MR's performance on tests related to visual processing "fell within the low average range overall."  (*Id*. ¶ 57.)  Weschler also reported that MR's auditory processing ability "fell within the average range for [MR's] age."  (*Id*. ¶ 58.)  The report also stated that MR's processing speed was "in the extremely low range consistent with [MR's] prior school based evaluation[.]"  (*Id*. ¶ 59.)  Weschler reported that MR's ability to retrieve learned information from memory was within the borderline range, (*id*. ¶ 60), and that MR's "short-term memory was measured in the extremely low range overall," (*id*. ¶ 61). Weschler disagreed with Dr. Dietrich's assessment that MR had "at least average intellectual abilities."  (*See id*. ¶ 62; IHO Hr'g Tr. 211.)

At the conclusion of the testing, a straightforward comparison of the subtest scores from the WJTA, which was taken in both 2012, (2013–14 CSE Meeting 3–4), and 2015, (Ex. R ("Educational Evaluation") 1), results in the following chart, which lists percentile rank for each subtest and the coordinating "classification":

| MR 2012 v. 2015 Scores Comparison ("Chart 1") | | |
|---|---|---|
| **WJTA Subtests** | **February 16, 2012 Results** (2013–14 CSE Meeting 3–4.) | **April 6, 2015 Results** (Educational Evaluation 1.) |
| **Letter Word Identification** | 10 (low average) | 5 (low) |

| Reading Fluency | 2 (low) | 1 (very low) |
| Passage Comprehension | 3 (low) | 9 (low) |
| Word Attack | 14 (low average) | 17 (low average) |
| Calculation | 27 (average) | 8 (low) |
| Applied Problems | 11 (low average) | 10 (low average) |
| Writing Fluency | 11 (low average) | 4 (low) |
| Math Fluency | 3 (low) | 2 (low) |
| Spelling | 10 (low average) | 6 (low) |

According to the Educational Evaluation, a percentile rank "indicates the percentage of individuals of the same age who scored the same or lower than the examinee and is scored on a scale of 1–99." (Educational Evaluation 1.) These scores are meant to indicate "the student's standing within this particular grouping." (*Id*.)

AR was "concerned" about the lower percentile ranks and drops in classifications for certain subjects, such as reading fluency, calculation, writing fluency, applied problems, math fluency, and spelling, from 2012 to 2015. (IHO Hr'g Tr. 544.) Plaintiffs were also concerned by Dr. Dietrich's and Dr. Wise's assessments that indicated, for the first time thus far, that MR had CAPD and was dyslexic. (*Id*. at 519–20.) AR testified that, after receiving this information, she "learned that [MR] . . . would need [a different type of environment] than what [the District] was currently doing." (*Id*. at 520.) Dr. Dietrich recommended EHS to Plaintiffs, because "[t]ime was running out . . . to address [MR's] disability" and that MR "needed to be evaluated as a child with a significant learning disability." (*Id*. at 1232.)

### 3. 2015–16 IEP

On June 5 and June 12, 2015, the CSE convened to develop an IEP for the 2015–16 school year. (Def.'s 56.1 ¶ 63.) Weschler participated in both CSE meetings, (*id*. ¶ 64), and Dr. Dietrich participated in the June 5, 2015 CSE meeting by telephone, (Ex. A ("2015–16 CSE Meeting") 1.) Notes from that meeting state that "Dr. Dietrich presented her report," which

stated that her sessions administering the testing "were shorter in length and that testing was conducted in multiple sessions due to attentional issues." (*Id*. at 2.) At the meeting, the special education teacher noted to the CSE that MR had made "a year's growth" of academic progress over the course of the school year. (*Id*.) Weschler stated that "there were two areas of significant discrepancy between the school psychologist and private psychologist's reports, specifically thinking and verbal reasoning abilities." (*Id*.) The "private psychologist," i.e., Dr. Dietrich, then opined that the discrepancies "reflect that the testing done privately were [sic] easier tasks for [MR]." (*Id*.) The notes also state that Dr. Dietrich noted multiple "Specific Learning Disorder[s]" as to reading, writing, and math. (*Id*.) The "school psychologist," i.e., Weschler, "commented that the [D]istrict's report reflect [sic] that [MR] is currently performing better than the academic achievement level that was predicted based upon [MR's] cognitive scores." (*Id*.) Dr. Dietrich also noted at the meeting that MR showed signs of Attention Deficit Disorder ("ADD") but that this was "not included in the report." (*Id*.) The meeting notes acknowledged the growth that MR was reported to have achieved in speech language evaluation but mentioned that Plaintiffs "questioned" why they were different than the audiology testing conducted by Dr. Wise, which diagnosed MR with CAPD. (*Id*.)

The CSE discussed referring MR for additional testing to resolve the discrepancies noted between Weschler's and Dr. Dietrich's findings. (Def.'s 56.1 ¶ 73.) At the meeting, Plaintiffs' attorney informed the CSE that Plaintiffs would agree to additional testing. (*Id*. ¶ 74.) However, that additional testing never happened because Plaintiffs subsequently withdrew their consent. (*Id*. ¶ 75.) At the IHO Hearing, AR testified that Plaintiffs became concerned about providing consent when they came to believe that some of the paperwork related to the additional testing was sent to the incorrect individual. (IHO Hr'g Tr. 562–63.) Plaintiffs purport that, following

that incident, they once again "asked [the District] for clarification as to why" MR needed

additional testing.  (*Id*. at 563.)  AR testified that, after asking that question, she sent a follow-up

letter expressing concerns that she did not want her "child to be a guinea pig."  (*Id*. at 564; *see

also* Ex. LLL ("June 2015 AR Letter").)  Plaintiffs claim that they never heard back from anyone

at the District, so they withdrew their consent.  (IHO Hr'g Tr. 565.)

Ultimately, the 2015–16 CSE recommended special education classes, with a ratio of

12:1+2, in Language Arts, Math, and Social Studies.[2]  (Def.'s 56.1 ¶ 76.)  The CSE

recommended related services in speech-language and occupational therapy, (*id*. ¶ 77); special

classroom accommodations, such as cuing MR to stay on task, breaking directions and tasks into

smaller components, pairing visual and auditory supports, and allowing reasonable movement

breaks after 10 minutes of handwriting, (*id*. ¶ 78); an extended school year with special classes in

reading and math, (*id*. ¶ 79); and weekly counseling sessions to address MR's self-esteem

concerns, which Plaintiffs rejected, (*id*. ¶ 80).  The CSE also approved the use of a personal

auditory trainer/FM system and agreed to request clarification from Dr. Wise about which FM

system was necessary for MR.  (*Id*. ¶ 81.)  The CSE agreed to reduce background noise within

the classroom.  (*Id*. ¶ 82.)

However, Plaintiffs "expressed concern with [MR's] ability to learn in a large class

environment and that [MR was] not making progress at the rate that their private psychological

evaluation would seem to indicate."  (*Id*. ¶ 83.)  At the conclusion of the meeting, Plaintiffs'

attorney informed the CSE that they rejected the proposed placement and reserved their right to

---

[2] This ratio of three numbers means 12 students, 1 teacher, and 2 paraprofessionals per
class.  *See E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 544 n.4 (S.D.N.Y. Feb. 16, 2016)
("The ratio's format expressed in three numbers indicates students:
teachers[+]paraprofessionals.").

seek tuition.  (*Id.* ¶ 84.)  On July 25, 2015, Plaintiffs informed the District in writing that they intended to unilaterally place MR at EHS for the 2015–16 school year.  (*Id.* ¶ 85; *see also* Ex. H ("July 2015 AR Letter").)

### 4.  2016–17 IEP

On May 19, 2016, the CSE met to discuss MR's placement for the 2016–17 school year. (Def.'s 56.1 ¶ 113.)  MR's special education teacher, speech and language therapist, and advisor at EHS participated via telephone.  (*Id.* ¶ 114.)  The EHS representatives informed the CSE that MR had a second-grade level reading instruction and program, (*id.* ¶ 115); that MR demonstrated "good progress" in speech and language but that "expressive language remains very delayed," (*id.* ¶ 116); that MR was "not fluent with addition and subtraction facts," as MR "counts on [] fingers," (*id.* ¶ 117); and that MR "has difficulty comprehending word problems," (*id.* ¶ 118). The notes for the CSE meeting state that, after about half an hour of participation from EHS personnel, Plaintiffs' counsel "reminded the [EHS] staff that they had agreed to participate in the CSE meeting for half an hour and that the half hour was up."  (Ex. B ("2016–17 CSE Meeting") 2.)

The notes indicate that, although the chair of the meeting asked the EHS team to continue to participate "to discuss appropriate goals for the 16/17 school year," Plaintiffs' counsel stated that EHS staff "were not responsible for writing goals."  (*Id.*)  Even after the chair stated that EHS's comments on proposed goals "would be very helpful to the CSE," Plaintiffs' counsel "insisted the [EHS] team leave the meeting, commenting that [Plaintiffs] did not want the [EHS] staff to participate."  (*Id.*)  Audio of the 2016–17 CSE meeting indicates that Plaintiffs' attorney, upon a request from a District representative to have EHS personnel stay on the line for further questioning about MR's upcoming goals, stated that he would not "allow [EHS] to write goals

for the [District]." (Ex. B-1 ("2016–17 CSE Meeting Audio") Part 2 at 3:54–59).) Plaintiffs'

counsel also stated they "have to get back to work as well," and that EHS personnel "don't have

all day to spend at a CSE meeting." (*Id*. at Part 2 4:45–55.) A District representative stated that

they needed five minutes to finish questioning the EHS team,[3] but Plaintiffs' counsel repeatedly

stated that the decision to have the EHS team leave the phone call was "final" and that Plaintiffs

did not want the EHS team to be involved in goal-setting with the CSE. (*Id*. at Part 2 4:50–5:10.)

A member of the EHS team then spoke, upon prompting by Plaintiffs' counsel, stating that it

would be very difficult to coordinate with the District on goal-setting because the goals at EHS

were "quite different" from what would occur in a "different setting," primarily due to the

difference in teachers and small class size. (*Id*. at Part 2 5:10–55.)

Dr. Dietrich also participated in the CSE via telephone. (Def.'s 56.1 ¶ 120.) In March

and April 2016, Dr. Dietrich had re-evaluated MR and once again administered the WISC-IV

and KABC-II. (*Id*. ¶ 121.) On the WISC-IV, MR's scores were all in the "low average" or

"very low" ranges. (*Id*. ¶ 122.) Dr. Dietrich said that, as a result of the spring 2016 evaluation,

she believed that MR was of "low average intelligence." (*Id*. ¶ 123.) Dr. Dietrich told the CSE

that MR "remain[ed] very compromised in the area of decoding and spelling, as well as

significant deficits in the skills needed to read and word finding skills." (*Id*. ¶ 124.) Dr. Dietrich

also reported no progress in math or spelling. (*Id*. ¶ 125.)

For the 2016–17 school year, MR's IEP contained substantially the same

recommendations as the previous year, i.e., instruction in 12:1+2 special education classes in

Language Arts, Math, Social Studies, and Science; the provision of speech-language and

---

[3] It is unclear what exactly the District thought would take five minutes to do as Plaintiffs' counsel interrupted, and the District representative's voice becomes difficult to hear on the tape. (2016–17 CSE Meeting Audio Part 2 at 4:50–59.)

occupational therapy; an extended school year with special classes in reading and math; and a variety of in-class accommodations to keep MR on task. (*Id.* ¶¶ 126–28.) Plaintiffs informed the CSE that they rejected the IEP and reserved the right to seek tuition reimbursement for a unilateral placement at EHS. (*Id.* ¶ 129.) On August 22, 2016, Plaintiffs informed the District in writing that they would place MR unilaterally at EHS for the 2016–17 school year. (*Id.* ¶ 130.)

### 5. 2017–18 IEP

On April 20, 2017, the CSE met to discuss MR's placement for the 2017–18 school year. (*Id.* ¶ 131.) EHS staff members attended the CSE via telephone, similar to the previous year. (*Id.* ¶ 132.) A District special education teacher, Jessica Nappi ("Nappi"), also participated. (*Id.* ¶ 133.) At the meeting, Nappi represented that, if placed in the District, MR would be instructionally grouped with students of similar needs, and the teacher would be able to break classes into smaller groups based on level to address specific skill areas. (*Id.* ¶ 144.)

At the end of the meeting, the CSE proposed the following: 12:1+2 special education classes for all academic subjects, (*id.* ¶ 135); placement in a special education class for "Support and Skills," (*id.* ¶ 136); speech-language therapy three times a week and occupational therapy once a week, (*id.* ¶ 137); a variety of in-class accommodations to help keep MR on track and focused, (*id.* ¶ 138); access to a personal auditory trainer/FM system, (*id.*); and an extended school year with summer special education classes in reading and math, (*id.* ¶ 140). Plaintiffs requested to visit the classroom, and were given an opportunity to observe. (IHO Hr'g Tr. 620–21.) AR expressed concerns after her observation, including that, in one of the classrooms, "[t]here were no visuals that were used," and there "was a lot of talking by the teacher." (*Id.* at 621–22.) AR also noticed that the children were distracted by ongoing noise. (*Id.* at 622.) Furthermore, when AR went to observe a teacher assistant reading with two children on the other

side of the classroom, AR noticed that she was "reading very low" and "was whispering." (*Id.* at 622–23.) As for the math classroom, AR noted that there were not "a lot of visuals" present, although she did notice a white board "filled with all of the different things that [Nappi] was trying to explain." (*Id.* at 624–25.)

Following the visit, in a letter dated August 4, 2017, Plaintiffs informed the District that they would be unilaterally placing MR at EHS for the 2017–18 school year. (Def.'s 56.1 ¶ 141.)

### 6. IHO Decision

Plaintiffs requested an impartial hearing to address their request for tuition reimbursement via letter dated June 12, 2017. (*Id.* ¶ 142.) On March 1, 2018, after the impartial hearing concluded, the IHO issued a decision. (*See* IHO Decision.)[4] The IHO determined that the District had "met its burden of showing" that the 2015–16, 2016–17, and 2017–18 "IEP recommendations were reasonably calculated to enable [MR] to make progress appropriate in light of [MR's] circumstances." (*See id.* at 23, 35, 39.) As to the 2015–16 IEP, the IHO found that MR "would be grouped with students of similar needs and abilities, that [the] program and services would be appropriate, and that [MR] reasonably could be expected to continue to make progress." (*Id.* at 24–25.) As to the 2016–17 IEP, the IHO found that the case "might be even stronger" for the District that MR "would have been grouped with students of similar needs and abilities and that [MR's] program and services would have been appropriate." (*Id.* at 35.) The IHO based this conclusion in part on the information that EHS staff provided at the CSE about MR's progress. (*Id.*) As to the 2017–18 IEP, the IHO specifically noted that the finding of reasonableness was founded in part on "credit[ing] the testimony of the [District's] special

---

[4] The IHO Decision was also part of the State Administrative Hearing Record provided to the Court. In the agency's system, it is designated Case No. 504063.

education teacher regarding the class composition" and the CSE's additions to the IEP of the "Support and Skills" class, as well as a "monthly Teacher for Hearing Impaired Consultation for school personnel." (*Id*. at 39.) For each IEP, the IHO noted for the record on appeal that the IHO also found that Plaintiffs had met their burden of showing that EHS met MR's needs and that equitable considerations also generally weighed in favor of providing Plaintiffs with tuition reimbursement. (*Id*. at 35–36.) However, because the IHO also found that each IEP was "reasonably calculated to enable [MR] to make progress appropriate in light of [MR's] circumstances," the IHO ultimately concluded that the Plaintiffs' request for tuition reimbursement should be denied. (*Id*. at 39, 40.)

### 7. SRO Decision

Plaintiffs appealed the IHO's decision denying their requests for tuition reimbursement to the SRO. (Def.'s 56.1 ¶ 152.) The District appealed the IHO's other two findings, i.e., that EHS was an appropriate private school placement for MR and that equitable considerations weighed in favor of the parents. (*Id*. ¶ 153.) On July 5, 2018, the SRO issued a decision in which it denied both appeals. (*Id*. ¶ 154.)

In its decision, the SRO found that "the evidence in the hearing record shows that the June 2015 IEP was reasonably calculated to enable the student to make progress appropriate in light of [MR's] circumstances." (SRO Decision No. 18-042 ("SRO Decision") 21.) This conclusion was partly based on "the progress [MR] exhibited during the 2014–15 school year," which suggested that it "was reasonable for the [D]istrict to offer a similar program for the 2015–16 school year." (*Id*.) The SRO also found that it was reasonable to offer a similar IEP for 2016–17. (*See id*. at 26.) As to 2017–18, the SRO found that the District had "considered [MR's] progress and continuing needs, and offered [MR] an [IEP] that was similar to but not the

same as the 2016–17 program," and that this program was also "reasonably calculated to enable [MR] to receive educational benefits in light of [MR's] circumstances." (*Id*. at 29.) The SRO stated that because it found that the IEPs were appropriate, it was "not necessary to determine whether [EHS] was an appropriate unilateral placement or whether equitable considerations support the parents' claim, and the necessary inquiry is at an end." (*Id*. at 31.) Therefore, the SRO did not squarely address the questions that the District had raised on its appeal of the IHO Decision.

### 8. EHS

MR started at EHS in the fall of 2015, the start of sixth grade. (Def.'s 56.1 ¶ 86.) EHS has approximately 250 students, all of whom have language-based disabilities. (*Id*. ¶¶ 87–88.) Students at EHS are not assigned letter or numerical grades, (IHO Hr'g Tr. 1039), but instead receive detailed reports about the specific advancements and challenges the student has encountered within an academic period, (*see* Exs. F ("2015–16 EHS Report"); G ("2016–17 EHS Report").) At the hearing before the IHO, Tara Clancy ("Clancy"), parent advocate and admissions assistant at EHS, was the only EHS representative to provide testimony. (Def.'s 56.1 ¶¶ 90–91.) Clancy provided testimony about EHS practices, stating that the school's program "is set up to meet the learning and motivational and social-emotional needs of kids with language-based learning needs." (IHO Hr'g Tr. 945.) Clancy stated that, in addition to "instructional support during their classes," EHS students also receive support from special education teachers in art or music classes, at lunch, and study hall. (*Id*. at 946–47.) The purpose is "to facilitate communication . . . and to support language all day for kids who have that need." (*Id*.) Clancy was also asked, "Other than the features of [EHS] which in [sic] the program itself, are there any other special accommodations for attention deficit that were added to [MR's] program that you

are aware of ?," to which Clancy responded, "Not that come to mind at the moment." (*Id*. at 1064–65.)

EHS used a variety of tests to assess MR's progress in writing and reading, including the Writing Assessment Program ("WrAP"), (*see id.* at 983–84), the Gray Oral Reading Test ("GORT"), (Def.'s 56.1 ¶ 106), and the Slosson Oral Reading Test ("SORT"), (*id*.). The WrAP is "a direct measure of writing ability that is administered in two classroom sessions during which students think about, write, revise, and produce a final essay on an assigned topic or prompt." (2016–17 EHS Report 40.) According to Clancy, MR's 2016 WrAP scores indicated that MR was "at the lowest percentile" according to both "suburban and independent norms." (IHO Hr'g Tr. 981.) However, Clancy also noted that over MR's time at EHS, MR had "held [] performance against [] non-disabled peers." (*Id*. at 983.) The GORT is an oral reading test administered on an individual basis that assesses the accuracy and fluency of a child's reading as well as literal and interpretive comprehension of the material. (Def.'s 56.1 ¶ 107.) GORT scores from an EHS report indicate that, from the "15–16 Spring" test to the "16–17 Spring" test, MR's rank increased from being in the first percentile for every subtest to scoring in the second percentile for "Rate," ninth percentile for "Accuracy," fifth percentile for "Fluency," and ninth percentile for "Comprehension." (2016–17 EHS Report at 35.) "The SORT is administered individually and assesses a child's ability to read sight words in isolation." (*Id*.) Between the "15–16 Spring" and "16–17 Spring" SORT tests, MR's grade equivalent increased from 3.7 to 4.2, although the standard score fell from 80 to 79. (*Id*.) The "grade equivalent" refers to a measure of what school grade year the child is performing at, i.e., a score of "3.2" is equivalent to the "second month of third grade." (*Id*.)

B.  Procedural History

Plaintiffs commenced this Action by filing the Complaint on October 31, 2018.  (Compl.)
Defendant filed an Answer on January 18, 2019.  (Ans. (Dkt. No. 8).)  The Parties jointly
suggested a summary judgment briefing schedule, which the Court approved, thus obviating the
need for any pre-motion conference.  (Dkt. No. 10.)  On April 4, 2019, Defendant wrote to the
Court, asking to submit the entirety of the administrative record sent from the SRO to the Court
in hard copy.  (Dkt. No. 11.)  On April 16, 2019, Plaintiffs joined that request, (Dkt. No. 13),
which the Court approved, on the condition that the Parties include "clear specific citations" in
their motions because the Court "will not search the record," (Dkt. No. 14).

On May 6, 2019, Plaintiffs filed the instant Motion for Summary Judgment and
accompanying papers.  (Not. of Mot.; Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.'
Mem."); Pls.' 56.1 Statement in Supp. of Mot. for Summ. J. ("Pls.' 56.1") (Dkt. Nos. 15, 16,
17).)  On June 4, 2019, in response to a letter from Plaintiffs' counsel, to which Defendant had
consented, the Court sealed Plaintiffs' 56.1 Statement because it contained confidential
information.  (Dkt. No. 20.)  Defendant filed its Opposition to Plaintiffs' Motion and a Cross
Motion for Summary Judgment, along with accompanying papers on June 6, 2019.  (Not. of
Cross Mot.; Def.'s 56.1: *see also* Def.'s Counterstatement to Pls.' 56.1 ("Def.'s Counter 56.1");
Def.'s Mem. of Law in Opp'n to Mot. and in Supp. of Def.'s Cross Mot. for Summ. J. ("Def.'s
Mem.") (Dkt. Nos. 22, 25).)  On the same day, a copy of the State Administrative Hearing
Record was received in the Clerk's office.  (*See* Dkt. (entry for June 10, 2019).)  Plaintiffs filed
their Reply and accompanying papers on June 20, 2019.  (Pls.' Reply Mem. of Law in Supp. of
Mot. and in Opp'n to Cross Mot. ("Pls.' Reply Mem."); Pls.' Counterstatement to Def.'s 56.1

("Pls.' Counter 56.1") (Dkt. Nos. 29, 30).) Defendant filed its Reply on July 8, 2019. (Def.'s Reply Mem. in Opp'n to Mot. and in Supp. of Cross Mot. ("Def.'s Reply Mem.") (Dkt. No. 31).)

## II. Discussion

### A. Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public education"—a "FAPE," for short—to "all children with disabilities." 20 U.S.C. § 1412(a)(1)(A); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 992–93 (2017) (same). A FAPE "includes both 'special education' and 'related services,'" which a state must provide to a disabled child "'in conformity with the child's individualized education program,' or IEP." *Endrew F.*, 137 S. Ct. at 994 (quoting § 1401(9)(D)) (alteration omitted). "School districts, through a CSE, are responsible for formulating a written IEP for every qualifying child." *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016) (footnote omitted); *see also* 20 U.S.C. § 1414(d) (same).[5] "The IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *L.O.*, 822 F.3d at 102–03 (quotation marks omitted); *see also Endrew F.*, 137 S. Ct. at 994 (listing statutory criteria governing IEPs).

"The IDEA . . . requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001; *see also Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 757 (2d Cir. 2018) ("Prior

---

[5] "In New York, the state has assigned responsibility for developing IEPs to local CSEs. CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *L.O.*, 822 F.3d at 102 n.4 (alteration, citations, and quotation marks omitted); *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a).

decisions of this Court are consistent with the Supreme Court's decision in *Endrew F.*"); *L.O.*, 822 F.3d at 103 ("To comply with the provisions of the IDEA, the IEP must be reasonably calculated to enable the child to receive educational benefits." (quotation marks omitted)).  There is no "bright-line rule" determining "what 'appropriate' progress" means; rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created."  *Endrew F.*, 137 S. Ct. at 1001; *see also S.C. v. Katonah-Lewisboro Cent. Sch. Dist.*, 175 F. Supp. 3d 237, 250 (S.D.N.Y. 2016) ("The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." (quotation marks omitted)), *aff'd sub nom. J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53 (2d Cir. 2017).  The Supreme Court has explained that "[f]or children receiving instruction in the regular classroom, this would generally require an IEP reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."  *Endrew F.*, 137 S. Ct. at 996 (quotation marks omitted).  But, for "a child who is not fully integrated in the regular classroom and not able to achieve on grade level . . . his [or her] IEP . . . must be appropriately ambitious in light of his [or her] circumstances."  *Id.* at 1000.  In other words, an IEP "providing merely more than de minimis progress from year to year" is insufficient, *id.* at 1001 (italics and quotation marks omitted), but, it also need not "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 199 (1982), or "provide[] everything that might be thought desirable by loving parents," *S.C.*, 175 F. Supp. 3d at 250.  Moreover, "[b]ecause the law expresses a strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs," and "[o]nly 'when the nature or severity' of a child's disability

is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(5); *id.* § 1401(a)).

"[The] IDEA also provides a variety of procedural safeguards with respect to the provision of [a FAPE] by school districts." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 81–82 (2d Cir. 2005) (quotation marks omitted); *see also* 20 U.S.C. § 1415 (listing safeguards). "[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206. On the other hand, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA," *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009), although "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not," *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012). Specifically, a procedural violation violates the IDEA only if it

> ([i]) impeded the child's right to a free appropriate public education;
> ([ii]) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
> ([iii]) caused a deprivation of educational benefits.

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525–26 (2007) (citation and quotation marks omitted).

In New York, if a parent believes that his or her child is being denied a FAPE, the parent may request an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be

challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A). *See also L.O.*, 822 F.3d at 103 (describing the appeal process).

B. Standard of Review

The Court's inquiry under the IDEA is limited to addressing (1) whether the District "complied with the procedures set forth in the Act" and (2) whether the IEP "developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07. Unlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010) (same), *aff'd*, 486 F. App'x 954 (2d Cir. 2012). Instead, summary judgment in IDEA cases is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask*, 397 F.3d at 83 n.3 (quotation marks omitted); *see also G.B.*, 751 F. Supp. 2d at 570 (same). The Court's review therefore "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete de novo review." *L.O.*, 822 F.3d at 108 (quotation marks and italics omitted). Accordingly, the Court must "engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012) (quotation marks omitted).

However, such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. "To the contrary, federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the

specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.H.*, 685 F.3d at 240 (quotation marks omitted). To merit deference, the IHO's and SRO's decisions must be "thorough and careful." *S.C.*, 175 F. Supp. 3d at 252 (quotation marks omitted). The quality of the decision can be judged on factors such as whether it is "well-reasoned" and "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (quotation marks omitted); *L.O.*, 822 F.3d at 109 ("To merit deference, the SRO's or IHO's factual findings must be reasoned and supported by the record." (alteration and quotation marks omitted)). Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO. *See M.H.*, 685 F.3d at 244.

Further, generally, "courts must defer to the reasoned conclusions of the SRO as the *final* state administrative determination." *Id.* at 246 (emphasis added); *see also A.C.*, 553 F.3d at 171 (noting that "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight," because the court must "defer to the final decision of the state authorities" (quotation marks omitted)). However, if the Court concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis.

*M.H.*, 685 F.3d at 246. Therefore, this Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned,

in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189; *see also C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *5 (S.D.N.Y. Jan. 3, 2013) ("[T]he Second Circuit [has] explained that the deference owed to an SRO's decision depends on the quality of that opinion, or its persuasiveness." (citation and quotation marks omitted)), *aff'd*, 552 F. App'x. 81 (2d Cir. 2014).

C. Analysis

Plaintiffs argue that Defendant failed to provide MR with appropriate IEPs for three school years, 2015–16, 2016–17, and 2017–18. (Pls.' Mem. 1.) Plaintiffs posit that the IHO's initial findings that each of the IEPs were adequate and the SRO's affirmance of those findings were incorrect. (*Id.*) In contrast, Plaintiffs argue that the IHO's findings that MR's placement at EHS was appropriate and that the equities weigh in favor of reimbursing Plaintiffs were correct and that the Court should agree with the IHO on these points. (*Id.*) Defendant makes the inverse of all of these arguments, asking the Court to uphold the SRO's decision regarding the adequacy of the three IEPs while arguing that the IHO's decisions regarding the appropriateness of EHS and the balance of inequities are incorrect. (*See generally* Def.'s Mem.)

Although the Court is sympathetic to Plaintiffs' plight in seeking the best possible education for MR, the record does not show that the SRO's decision was not well-founded or that Plaintiffs should be reimbursed for their tuition expenses at EHS.

1. Applicable Law

The Supreme Court has repeatedly held that if a state fails in its obligation to provide a disabled child a FAPE under the IDEA, the IDEA permits parents to seek reimbursement from the school district for the private placement of their child. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–47 (2009); *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7,

12 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985). The IDEA allows a district court hearing civil actions brought under the IDEA to grant "such relief as the court determines is appropriate." *Forest Grove*, 557 U.S. at 237 (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). However, parents who unilaterally withdraw their child from the public schools in favor of a private placement do so at their own financial risk. *See A.C.*, 553 F.3d at 171.

In deciding whether tuition reimbursement for such a private placement is warranted, a court must first consider (1) "whether the state has complied with the procedures set forth in the IDEA," and (2) "whether the IEP developed through the [IDEA's] procedures is reasonably calculated to enable the child to receive educational benefits." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005) (citation, alteration and quotation marks omitted). If the answer to these questions is yes, no reimbursement is permissible. *See id.* ("If these requirements are met, the State has complied with the obligations imposed by Congress[,] and the courts can require no more." (citation and quotation marks omitted)). If no, the court then considers (3) "whether the private schooling obtained by the parents is appropriate to the child's needs." *Id.* (citation omitted). Where that is the case, "equitable considerations" must "support the [parents'] claim." *A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 205 (S.D.N.Y. 2010) (citation omitted); *see also Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363–64 (2d Cir. 2006) ("[E]quitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief." (second alteration in original) (quoting *Burlington*, 471 U.S. at 374)). Because a court may order "such relief" as it deems "appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii), and because a reimbursement award is discretionary, *see id.* § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the

parents for the cost of [private] enrollment . . . ."), courts "enjoy[] broad discretion in considering equitable factors relevant to fashioning relief," *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citing *Carter*, 510 U.S. at 16).

Typically, where, as here, "an IEP is substantively, rather than procedurally challenged, the parents or guardians must show that the school district failed to devise a plan 'that is likely to produce progress, not regression,' 'and which fails to afford the student with an opportunity greater than mere trivial advancement.'" *H.C. v. Katonah-Lewisboro Union Free Sc. Dist.*, No. 09-CV-10563, 2012 WL 2708394, at \*13 (S.D.N.Y. May 24, 2012) (alteration and quotation marks omitted) (quoting *Cerra*, 427 F.3d at 195), *aff'd* 528 F. App'x 64 (2d Cir. 2013).[6]

### 2. 2015–16 IEP

Plaintiffs argue that the SRO "wrongly found" that the 2015–16 IEP was appropriate for MR. (Pls.' Mem. 12.) To support their argument that MR should not have been placed in self-contained special education classes, Plaintiffs point to Dr. Dietrich's findings, which indicated that MR was of "average intelligence" and instead suffered from a number of other untreated disorders, such as CAPD and dyslexia. (*Id.* at 12–13.) Moreover, Plaintiffs argue that the decline of some testing metrics between 2012 and 2015 suggest that MR's IEPs leading up to 2015 had been inadequate. (*See id.* at 13; *see* Chart 1, *supra*.) Defendant counters that the SRO properly considered all these arguments and that the SRO's judgment on the propriety of the 2015–16 IEP should not be disturbed. (Def.'s Mem. 15–22.)

---

[6] Plaintiffs write generally about the law pertaining to procedural violations in the context of IDEA, but they do not allege there were any procedural errors. (*See* Pls.' Mem. at 5.) Accordingly, the Court does not address—nor does it see—an argument that there were also procedural, as opposed to purely substantive, errors during MR's IEP process.

Progress under a prior IEP or a set of IEPs may be considered when determining whether a subsequent IEP is appropriate. *See Adrianne D. v. Lakeland Cent. Sch. Dist.*, 686 F. Supp. 2d 361, 367–68 (S.D.N.Y. 2010). Here, the SRO "thorough[ly] and careful[ly]" reviewed MR's progress for the school years prior to 2015. *See M.H.*, 685 F.3d at 241 (citation and quotation marks omitted). For example, the SRO conducted a searching and insightful inquiry into the various forms of assessments that MR underwent while MR was enrolled in public school. (*See* SRO Decision 13–20.) The SRO acknowledged Plaintiffs' argument about the drop in MR's WJTA scores, but concluded that, without further information concerning the circumstances of this drop, "it is not clear from these results that the student 'regressed' or did not make gains against [MR's] own earlier performance in these areas." (*Id*. at 20.) The SRO noted that "in some areas cited by [Plaintiffs] as areas of regression, the change in percentile rank did not result in a change in the scores' 'classification' and therefore would suggest that the student was progressing in light of [MR's] circumstances." (*Id*. at 20 n.1.) Indeed, for math fluency, MR was categorized as "low" in both 2012 and 2015 and for applied problems, MR was classified as "low average" in both years. (*See* Chart 1, *supra*.) After examining the discrepancy in scores, one of Plaintiffs' primary arguments as to why they believed MR's prior IEPs were inadequate, the SRO concluded that "[w]ithout evidence speaking directly in support of [Plaintiffs'] interpretation of the subtest scores, these testing results, at best, reflect the student's performance on a given day, and, most likely, without the benefits of testing accommodations afforded to [MR] under [the] IEP; therefore, the results, standing alone, cannot provide as complete a picture of the student's abilities or progress over a given school year with the supports and services provided to [MR] in the [D]istrict's special class program." (SRO Decision at 20.) Accordingly, the SRO gave more weight to evidence of years of progress reports and report cards, which

demonstrated, after MR had been moved to a self-contained special education class at the beginning of the 2012–13 school year, the following examples of progress, among many others: "the May 2013 IEP noted that [MR] had increased [] ability to more fluently recall letters and sounds . . . , create sentences with structured words and ideas, and had progressed from writing two to three word sentences phonetically to five to eight words while using spacing and some punctuation," (*id*. at 14); "[the 2013–14 school] year's second term report card characterized [MR] as having an 'amazing' trimester, noting that [MR] was making steady gains in decoding and reading comprehension, had advanced from book A to book D in the PAF reading program, was becoming more fluent, and [MR's] articulation was less labored," (*id*. at 14–15); the report card for the final term of the 2013–14 school year "stated that [MR] . . . went from an end of the kindergarten level to a beginning of second grade level" in reading, (*id*. at 15); and according to MR's final term report card for the 2014–15 school year, MR had "continued to make progress in reading . . . , also made progress in math[,] [and] staff were 'proud of [MR's] steady growth and progress'," (*id*. at 16). The SRO also stated that "the evidence in the hearing record reflects that [Racanelli] met with the [District's] special education teacher to coordinate instruction, used the same reading program (PAF) as the [D]istrict, and that during the 2014–15 school year[,] [Racanelli] saw similar progress if not some additional progress to what was cited by the [District's] special education teacher." (*Id*. at 17.) Ultimately, the SRO, after weighing the strength of evidence on both sides, concluded that Plaintiffs' arguments regarding MR's "progress during the school years leading up to the development of the June 2015 IEP" failed to rebut the District's evidence of progress and that Plaintiffs' arguments, therefore, "must be dismissed." (*Id*. at 20.)

The SRO then went on to evaluate the 2015–16 IEP in light of its findings about the progress that MR had shown under the District's prior IEPs. (*Id*. at 20–21.) The SRO noted that, although the 2015–16 IEP was "similar to [MR's] 2014–15 IEP" "[i]n some ways," the 2015–16 IEP "also included additional supports," which it added "[i]n response to the recent recommendations within the March 2015 audiological and central auditory processing evaluation report." (*Id*. at 21.) This, combined with the overall signs of progress exhibited by MR, led the SRO to conclude that "the [2015–16] IEP was reasonably calculated to enable the student to make progress appropriate in light of [MR's] circumstances," and that Plaintiffs "focused too narrowly on one set of scores," the import of which was not made clear on the record. (*Id*.)

The Court sees no reason to disturb the SRO's well-reasoned conclusion. Indeed, this appears to fall squarely within the universe of issues in which a district court should generally defer to the SRO's expertise. As the Second Circuit has explained, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.*, 685 F.3d at 244 (citation omitted); *see also L.B. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 14-CV-6805, 2016 WL 4926203, at *16 (S.D.N.Y. Sept. 14, 2016) (upholding administrative finding of IEP adequacy in the face of "conflicting testimony" because "it is not for a federal court to choose between the views of conflicting experts on a controversial issue of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence" (citation, quotation marks, and alterations omitted)); *S.A. ex rel. M.A.K. v. N.Y.C. Dep't of Educ.*, No. 12-CV-435, 2014 WL 1311761, at *15 (E.D.N.Y. Mar. 30, 2014) ("The sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers." (quoting *Grim v. Rhinebeck Cent.*

*Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003)) (alteration omitted)); *H.C.*, 2012 WL 2708394, at

*13–15 (upholding SRO's decision where the decision relied more on the school district's

experts than parents' experts and explaining that "any contention that a different reading

program or technique would have provided [the student] with a *better* education is . . . beyond

what the IDEA requires" (emphasis in original) (citations omitted)).  Where, as here, "an SRO

has evaluated the evidence presented by both sides and made a reasoned judgment, this Court

may not second-guess that decision."  *See id.* at *12 (citing *Grim*, 346 F.3d at 382–83).

Moreover, "[h]ere, deference is particularly apt where the IHO and SRO decisions are in

agreement and are based on the same record as that before [this Court]."  *B.K. v. N.Y.C. Dep't of

Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014) (citation omitted).[7]  Accordingly, the Court

upholds the SRO's determination that the 2015–16 IEP was reasonably tailored to MR's needs.[8]

---

[7] The SRO explicitly did not reach the IHO's determinations regarding the appropriateness of EHS or the equitable considerations but instead decided only on the question of the adequacy of the IEPs.  (SRO Decision 31.)  However, they both agreed that each of the IEPs was appropriate.

[8] To the extent that Plaintiffs intend to now renew their challenge to the adequacy of the annual goals in the 2015–16 IEP, that claim was properly deemed abandoned by the SRO.  (SRO Decision 12–13.)  Plaintiffs, on appeal to the SRO, "were obligated to clearly specify their reasons for challenging the IHO's decision; to identify the precise rulings presented for review; and to cite to the pertinent portions of the record on appeal.  Issues not so identified in the cross-appeal are properly deemed abandoned by the SRO."  *M.C., on behalf of J.C. v. Mamaroneck Union Free Sch. Dist.*, No. 17-CV-1554, 2018 WL 4997516, at *23 (S.D.N.Y. Sept. 28, 2018) (quotation marks and citations omitted).  The Court does not see such arguments in Plaintiffs' initial papers before the SRO, despite Plaintiffs' argument in its Reply that it did so "on pages seven to eight" of its memorandum before the SRO.  (*See* Pls.' Reply Mem. 6; Pls.' Mem. of Law in Supp. of SRO Appeal ("Pls.' SRO Appeal Mem.") 7–8.)  Regardless, this issue, even if it had been preserved, would not have been dispositive because "[c]ourts have been reluctant to find a denial of a FAPE based on failures in IEPs to identify goals," and at least one court has concluded that "even the complete absence of any goals did not result in a denial of a FAPE." *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011) (collecting cases), *aff'd* 526 F. App'x 135 (2d Cir. 2013).

### 3. 2016–17 IEP

Plaintiffs argue that the 2016–17 IEP was inadequate because it was "largely the same" as the 2015–16 IEP. (Pls.' Mem. 15.) Defendant counters that, once again, deference should be accorded to the SRO's evaluation of this IEP and that, regardless, similarity to prior IEPs is not, by itself, a reason to declare an IEP inadequate. (Def.'s Mem. 19.) The Court again defers to the SRO's expertise and sees no reason to disturb the SRO's well-reasoned conclusion that the 2016–17 IEP was also reasonably tailored to MR's needs. (*See* SRO Decision 26.)

In its analysis, the SRO considered submissions from the EHS team, as well as updates from EHS staff at the applicable CSE, all of which were available in the record. (*Id*. at 22.) The SRO noted that although the EHS staff believed that MR had "grown academically, socially and emotionally," they "also reported that [MR's] . . . language processing skills continued to adversely impact [MR's] progress." (*Id*. (citing to 2016–17 CSE Meeting).) The SRO also noted, while citing to meeting notes from the 2016–17 CSE meeting, that MR was still "not fluent in addition or subtraction facts," "had difficulty comprehending word problems," and, despite "good progress," still faced "delay[s]" in "expressive language skills." (*Id*. at 22–23.) The SRO examined the results of a private psychological exam conducted by Alan J. Strohmayer, Ph.D., ("Dr. Strohmayer") in May 2016. (*Id*. at 23; *see* Ex. E ("Dr. Strohmayer Evaluation").) The SRO noted that, although Dr. Strohmayer's evaluation concluded that MR had made "excellent progress" in language skills, he also found that MR had continued "significant needs," as indicated by "very low scores on tasks involving rapid naming and word-finding" and the continued existence of "a math disability." (SRO Decision 23 (citing to Dr. Strohmayer Evaluation).) The SRO noted that although Plaintiffs believe that the District "underestimated [MR's] intelligence," many aspects of Dr. Strohmayer's evaluation and

testimony confirmed that MR's "cognitive composite scores were in the low average . . . and very low" ranges. (*Id*. at 23 n.31 (citing to IHO Hr'g Tr.).)

In deciding that the 2016–17 IEP was appropriate, the SRO examined the 17 "annual goals," the special education class recommendations, and additional accommodations specifically for MR, such as additional small-group speech therapy, access to a personal auditory trainer, and cues to help MR stay on task, such as reasonable breaks and "breaking directions and tasks into smaller components." (*Id*. at 24.) The SRO reasoned that although it was possible— but not necessarily objectively certain—that MR benefitted *more* from the 2:1 tutorial program at EHS, this alone did not require the District to offer the exact same class size or program to meet its duties under IDEA. (*See id*. at 25.) Rather, MR needed "specially designed instruction to remediate [MR's] academic and language deficits," which the [D]istrict did provide within its IEP. (*Id*.) The SRO also addressed Plaintiffs' argument that the 2016–17 IEP was "largely the same" as prior IEPs and concluded that it was not unreasonable for the District to provide a similar program as before, especially because MR, despite "some progress" at EHS, "continued to exhibit significant academic and language deficits similar to those exhibited during previous school years." (*Id*. at 26 (citations omitted).)

Indeed, the SRO is correct that simply comparing the program at a private, unilateral placement to a school district's IEPs does not establish that the IEP failed to comply with the IDEA. *See Walczak*, 142 F.3d at 133 ("The inadequacy of an IEP is not established, however, simply because parents show that a child makes greater progress in a single area in a different program. . . . IDEA requires states to provide a disabled child with meaningful access to an education, but it cannot guarantee totally successful results." (citations omitted)); *R.B. v. NYC Dep't of Educ.*, No. 12-CV-3763, 2013 WL 5438605, at *15 (S.D.N.Y. Sept. 27, 2013) ("[T]he

appropriateness of the [District's] program is determined by its compliance with the IDEA's requirements, not by its similarity (or lack thereof) to the [unilateral placement's] program." (citation omitted)). The Court also agrees with Defendant that "[s]imilarities" between IEPs are not a basis for finding them to be inappropriate, particularly when, as here, District representatives, Plaintiffs, and EHS staff all participated in extensive discussions at the 2016–17 CSE meeting leading up to the IEP recommendation. *See P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 414 (S.D.N.Y. 2017) ("An IEP is not inappropriate, however, simply because it does not change significantly on an annual basis." (citation and quotation marks omitted)); *J.C.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896, 2013 WL 3975942, at *12 (S.D.N.Y. Aug. 5, 2013) ("To the extent there is some similarity between goals from year to year, such continuity makes sense. Modeling an IEP after the prior year's IEP, with appropriate changes, is a sensible practice that, as long as it is not done reflexively and without consideration of the student's individual circumstances and needs, does not signify that the student is likely to regress." (citation omitted)); *see also M.H.*, 685 F.3d at 256 (holding that even photocopying goals from the previous year was acceptable because the goals "remained appropriate for the child").

Moreover, as discussed above, Plaintiffs' substantive challenge to the IEP is precisely the kind of issue that merits deference to the SRO's thoughtful evaluation, because "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *Id.* at 245 (citation omitted); *see also L.B.*, 2016 WL 4926203, at *16 ; *S.A.*, 2014 WL 1311761, at *15; *H.C.*, 2012 WL 2708394, at *13–15. Where, as here, "an SRO has evaluated the evidence presented by both sides and made a reasoned judgment, this Court may not second-

guess that decision." *See id.* at *14 (citation omitted). And, as noted, "[h]ere, deference is particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before [this Court]." *B.K.*, 12 F. Supp. 3d at 360 (citation omitted). Accordingly, the Court upholds the SRO's determination that the 2016–17 IEP was appropriate.

### 4. 2017–18 IEP

Plaintiffs argue that the 2017–18 IEP was inappropriate as to MR because the District "continued to ignore the progress MR was making at EHS and failed to incorporate that progress into the IEP," and because, upon visiting the classroom designated for the IEP, AR was disappointed that it was the "same self-contained classroom with only disabled students," and, according to AR's observations, the students seemed distracted and unfocused. (Pls.' Mem. 17–18.) Defendant counters that similarities in placement are not a basis for finding them inappropriate and that the IEPs were "[c]ommensurate with [MR's] [a]bilities." (Def.'s Mem. 20–22.)

In its analysis, the SRO examined updates from EHS staff, who once again noted MR's improvements in many areas, such as being "more open to problem solving strategies" and progress in mathematics, but also indicated continued difficulties, such as problems "sustaining attention" and a score on the first percentile on a June 2016 administration of the GORT. (SRO Decision at 26–27.) The SRO also acknowledged input from Plaintiffs, who stated they had "seen many significant improvements in the areas of self-esteem, reading comprehension, and overall confidence, and felt the student had made 'awesome' progress at [EHS]." (*Id*. at 27 (citation omitted).) The SRO noted that EHS staff only used auditory assistance devices in their "two largest classes" and that, generally, speech-language therapy had helped MR "become more confident and more positive about [] learning." (*Id*. (citation omitted).)

While evaluating its adequacy, the SRO noted that the 2017–18 IEP was not exactly the same as prior IEPs and, instead, incorporated the addition of a "supports and skills" class that was similar to what EHS staff described as "Call Back" period, where "the teacher would re-teach and review lessons the student was having difficulty with." (*Id*. at 28.) The SRO also noted that, even though the IEP's class size recommendations were still 12:1+2, the District's special education teacher stated that she oversaw hearing services and "met with teachers to make sure that [MR's] auditory needs were being met in the classroom." (*Id*.) The SRO also noted that the IEP included three additional small-group or individual 40-minute sessions for speech-language services. (*Id*. at 29.) Therefore, according to the SRO, Plaintiffs were not correct in asserting that the IEP remained "largely the same," and the SRO concluded that the record showed that the District properly incorporated new information from EHS about MR to a reasonable extent and ultimately created an adequate IEP. (*Id*.)

The Court sees no reason to disturb the SRO's judgment; the SRO properly considered Plaintiffs' argument that the IEP failed to accommodate MR's progress at EHS and, after examining all the evidence on the record, disagreed with that characterization. As discussed above, Plaintiffs' substantive challenge to the IEP is precisely the kind of issue that merits deference to the SRO's thoughtful evaluation. *See M.H.*, 685 F.3d at 244; *L.B.*, 2016 WL 4926203, at *16 ; *S.A.*, 2014 WL 1311761, at *15; *H.C.*, 2012 WL 2708394, at *13–15. Where, as here, "an SRO has evaluated the evidence presented by both sides and made a reasoned judgment, this Court may not second-guess that decision." *See id.*, at *14 (citation omitted). As noted, "deference is particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before [this Court]." *B.K.*, 12 F. Supp. 3d at 360 (citation omitted). Finally, Plaintiffs' argument that AR's personal observations led her to have doubts

about the adequacy of the learning environment for MR does not alone support a conclusion that the IEP was objectively inadequate under the IDEA. *See A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 541 (2d Cir. 2017) ("Importantly, in order to avoid impermissibly meddling in state educational methodology, we must examine the record for any *objective* evidence indicating whether the child is likely to make progress or regress under the proposed plan." (citation, alteration, and quotation marks omitted) (emphasis added)); *P.C.*, 232 F. Supp. 3d at 408 (noting that, to comply with IDEA, a school district "need not provide everything that might be thought desirable by loving parents" (citation, alterations, and quotation marks omitted)). Accordingly, the Court upholds the SRO's determination that the 2017–18 IEP was reasonably tailored to meet MR's needs.[9]

---

[9] To the extent Plaintiffs imply that *Endrew F.*, 137 S. Ct. 988, somehow raised the standard of review applied to SRO decisions, the Court disagrees with that interpretation of the "cogent and responsive" language. *Id.* at 1002. In fact, when that paragraph is read in its entirety, it is clear that the Supreme Court is merely restating that federal courts *should* generally defer to the expertise of school authorities. The Supreme Court notes: "The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue. By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court *may fairly expect those authorities to be able to offer a cogent and responsive explanation* for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his [or her] circumstances." *Id.* at 1001–02 (emphasis added). The Supreme Court was not rolling back its call for deference to school authorities.

Regardless, given the depth to which the SRO discusses each of the IEPs and Plaintiffs' arguments as to each of them, the Court does find the SRO Decision to be "cogent and responsive."

## III. Conclusion[10]

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is denied, and

Defendant's Cross Motion for Summary Judgment is granted. The Clerk of Court is respectfully

directed to terminate the pending Motions, (Dkt. Nos. 15, 23), enter judgment for Defendant, and

close this case.

SO ORDERED.

DATED:     November 2/ , 2019
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[10] Because the Court upholds the SRO's determinations on the adequacy of each of the IEPs, the Court's inquiry ends there and does not reach the questions of whether EHS was an appropriate unilateral placement or whether the equities favor tuition reimbursement. *See Cerra*, 427 F.3d at 192 (noting that courts should proceed to the "third step" only when "the IEP is procedurally or substantively deficient"); *J.C.S.*, 2013 WL 3975942, at *14 (declining to reach the questions of appropriate unilateral placement or equitable considerations where the court concluded that the school district offered the student a FAPE).